IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KURT EUGENE SINDORF,<br><br>                    Petitioner,<br><br>          vs.<br><br>MATTHEW CATE, Secretary, California<br>Department of Corrections and<br>Rehabilitation,<br><br>                    Respondent. | No. 2:11-cv-01547-JKS<br><br>MEMORANDUM DECISION |

Kurt Eugene Sindorf, a state parolee appearing *pro se*,[1] filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254.  Sindorf is currently in the custody of the California Department of Corrections and Rehabilitation on parole.  Respondent has answered and Sindorf has replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

Following a court trial in the Siskiyou County Superior Court, Sindorf was convicted of one count of committing a lewd act upon a person of less than fifteen years of age (Penal Code § 288a(b)(3)), six counts of unlawful intercourse with a minor (Penal Code § 261.5(d)), one count of oral copulation with a minor (Penal Code § 288a(b)(2)), and two counts of attempting to dissuade a witness (Penal Code § 136.1(a)(2)).[2]  In December 2003 the trial court sentenced Sindorf to state prison for the upper term of four years for one of his convictions of unlawful

---

[1] Although the Petition was filed by Sindorf appearing *pro se*, Sindorf is presently represented by retained counsel who filed the Traverse.

[2] All references to the Penal Code are to the California Penal Code.

sexual intercourse, consecutive one-year sentences (one-third of the middle term) for two of his other convictions of unlawful sexual intercourse, a two year consecutive term for one of his convictions of attempting to dissuade a witness and concurrent middle terms for the remainder of his convictions, for an aggregate sentence of eight years.  After the California Court of Appeal, Third Appellate District, affirmed Sindorf's conviction in an unpublished decision, the California Supreme Court denied review; however, the Supreme Court granted *certiorari* and vacated and remanded the decision for resentencing.[3]  On remand, the California Court of Appeal vacated Sindorf's sentence and remanded the matter to the trial court for resentencing in an unpublished decision.[4]  On remand, the trial court reimposed the eight-year sentence, the Court of Appeal affirmed,[5] and the California Supreme Court denied review on March 10, 2010.  Sindorf timely filed his Petition for relief in this Court on June 7, 2011.

On October 22, 2012, this Court entered an order staying these proceedings pending completion of state-court proceedings, providing however that if proceedings were not commenced in the California Supreme Court by December 3, 2012, the stay would be terminated, the unexhausted claims dismissed, and the exhausted claims submitted for decision.[6]

---

[3] *People v. Sindorf*, No. C045737, 2005 WL 2542571 (Cal. Ct. App. Nov. 3, 2005), *vacated and remanded*, *Sindorf v. California*, 549 U.S. 1194 (2007) ("*Sindorf I*").

[4] *People v. Sindorf*, No. C045737, 2007 WL 4306839 (Cal. Ct. App. Dec. 11, 2007) ("*Sindorf II*").

[5] *People v. Sindorf*, No. C045737, 2009 WL 4878675 (Cal. Ct. App. Dec. 17, 2009) ("*Sindorf III*").

[6] Docket No. 24.

On December 3, 2012, Sindorf filed a status report in which he acknowledged that he was unable to develop sufficient factual support to support the unexhausted claims.[7]

The Court of Appeal summarized the evidence underlying Sindorf's conviction:

## FACTUAL BACKGROUND

*The Prosecution*

Christina M. was 10 years old when she first met [Sindorf] who was one of her mother's coworkers. She became more familiar with [Sindorf] when she was 15 years old. [Sindorf] often came into the store where Christina worked.

In September 2000, when she was 15 years old, [Sindorf], who was 37 years old at the time, began a sexual relationship with her. After a day of hunting in Redding with [Sindorf] and his five-year-old son, C., Christina invited them over to her house for dinner. Her mother was not at home. After dinner, when they were sitting on the couch watching TV and C. had fallen asleep, [Sindorf] said, "I don't know if I should do what I'm about to do." Not knowing what he was talking about, Christina replied, "You don't know until you try." [Sindorf] reached over and started to kiss her. [Sindorf] reached under Christina's shirt and touched her breasts over her bra. He laid her down on the couch and continued to touch her. Christina did not refuse him as she had some feelings for him. They moved to her bedroom where [Sindorf] undressed her and himself. [Sindorf] laid Christina down on her bed and got on top of her. He put first his fingers, then his penis into her vagina. After about 15 minutes of sex, they got dressed and went back out to the living room. [Sindorf] did not spend the night.

The next day Christina got an e-mail message that said: "Christina: Hi. It's 2:45, and I just got home and built a fire and washed the dishes from the a.m. I am now ready for bed and should get almost two hours of sleep. This should be plenty as I am partially running off the 'L' word, too, and this is definite boost. I had the time of my life tonight and I owe it all to you. Good luck at the game and know my thoughts are with you always. Love Kurt. P.S. Someone has fallen."

Approximately a week later, Christina had sex again with [Sindorf], this time at his house. [Sindorf] again penetrated her vagina with his fingers and penis. She spent the night with him in his bed.

A couple of weeks later, while Christina's mother was in the hospital, Christina and [Sindorf] had sex again at [Sindorf's] house. [Sindorf] touched Christina's breasts and placed his fingers in her vagina. Then they had intercourse. Christina spent the night in [Sindorf's] bed.

Around this time, [Sindorf] and Christina went to J.C. Penney's where [Sindorf] bought Christina an engagement ring, costing $1,000, to replace the promise ring he had earlier given her. [Sindorf] talked to Christina about marriage

---

[7] Docket No. 25.

and wanted to go to Hawaii where it was legal to get married before she turned 18. They discussed her current age.  [Sindorf] told Christina not to wear the ring in public or in front of her mother.

Christina and [Sindorf] made another trip to Redding within a month after [Sindorf] bought Christina the engagement ring.  On the way home in the car, [Sindorf] asked Christina to give him a "blow job" while he was driving.  She told him she was uncomfortable, but he wanted her to do it.  [Sindorf] undid his belt, unzipped his pants, and pulled them down.  Christina sucked on his penis for maybe two minutes.  She was really uncomfortable and stopped.  [Sindorf] put his arm around her and said it was okay.

On another occasion, between November and December 2000, Christina was up by [Sindorf's] house.  [Sindorf's] son C. was sleeping in the truck and [Sindorf] asked Christina to go into the house with him to have sex.  Although she felt bad because C. was sleeping in the truck, they went inside and had sex.

During November 2000 Christina, her mother Shirley, [Sindorf] and C. went on a trip to Canada.  One evening Christina's mom was not feeling well and wanted to stay at the motel.  Christina and [Sindorf] drove to a Denny's restaurant for something to eat.  [Sindorf] sat next to Christina and they were holding hands when Christina saw her mom standing at the window of the restaurant watching them.  Christina's mom came into the restaurant and yelled at Christina.  She demanded to know what was going on.  She wanted Christina to walk back to the motel and pack her stuff to go.  Christina defied her mother and refused.  Later when they were back in their motel room, Christina's mother threatened to "call the cops" if Christina would not leave with her.  [Sindorf] came to their room and told Christina to go with her mom.  Christina refused.  Her mother called the police, who came and took Christina and her mother to another hotel.

In December 2000, [Sindorf] sent Christina an e-mail to an address he had set up for her, stating: "Hi, Hon. Some may think they are winning the war, but my love grows stronger for you with each passing day.  Thank you for being the most beautiful thing in my life.  I love you more than words can say.  Think of me, and I will be by your side, I promise.  Love forever, Kurt."

Christina and [Sindorf] had a meeting spot by the elementary school by Christina's house, which they referred to as "the rock."  [Sindorf] set it up as a place to meet and leave each other letters.  After returning from Canada, around March of 2001, Christina and [Sindorf] were at the rock.  [Sindorf] laid his jacket on the ground and wanted to have sex.  Christina told him that she did not want to.  There was snow on the ground.  [Sindorf] told her everything would be okay and just to do what he told her.  He laid her down on his jacket and they had sex even though she told him no.

The last time Christina had sex with [Sindorf] was in March 2001 when Christina was supposed to meet [Sindorf] on the hill.  When he failed to show up, she started walking home.  [Sindorf] drove up and asked Christina to get in his truck.  Christina got in and they had sex.

4

Christina testified there was some concern she might be pregnant because [Sindorf] had not always used a condom.  [Sindorf] arranged for Kim, his ex-girlfriend and the mother of C., to visit Christina while she was at the College of the Siskiyou gymnasium playing volleyball.  Kim took Christina into the girl's locker room where she gave Christina a two-way radio to enable her to talk to [Sindorf] who was out in the parking lot.  [Sindorf] told Christina to take a pregnancy test Kim had with her, that he loved her and everything would be okay.  Christina took the pregnancy test, which turned out negative.  Kim took the test stick, put it in a ziploc bag and said [Sindorf] wanted to keep it for himself.  Christina gave inconsistent statements regarding when this pregnancy test occurred.

When Kim confronted [Sindorf] about being sexually involved with Christina, [Sindorf] denied it.  [Sindorf] did tell her at one point that he was only human and he could make mistakes.  [Sindorf] told her Christina tried to come on to him.

When Christina's mother got a restraining order against [Sindorf], [Sindorf] arranged for he and Christina to meet sometimes at Kim's home.

[Sindorf] wanted Christina to be on birth control because of continued concerns over pregnancy.  [Sindorf] and Christina went together to a health clinic. [Sindorf] was present for her physical examination because Christina was afraid to tell the nurse she didn't want him in the room.  He left the room when she changed back into her clothes.  Christina did not feel free to tell the nurse the entire truth because of [Sindorf's] presence.  She lied to the nurse about her sexual relationship with [Sindorf] because [Sindorf] told her to do so.

According to Christina, she lied when she denied any sexual relationship with [Sindorf] in early interviews with law enforcement.  She was afraid to tell the truth and she still had some positive feelings for [Sindorf].

Prior to the preliminary hearing, Christina saw [Sindorf] and walked up to his truck.  [Sindorf] told Christina to go to Kim's house the following night as Kim needed to talk to her.  When Christina followed [Sindorf's] instructions, she discovered it was not Kim who wanted to talk to her, but [Sindorf].  [Sindorf] told her if she loved him, she would not testify.  He told her to think of what she would be doing to C. if she testified.

Michelle Hobbs, a friend of [Sindorf's], came up to Christina at the store where Christina worked.  She showed Christina a picture of C. and gave her an envelope with a message from [Sindorf] that if she loved C. and loved [Sindorf], she wouldn't say anything.  The preliminary hearing was coming up.  Ms. Hobbs then took the items back and returned them to [Sindorf].  [Sindorf] told Ms. Hobbs not to tell the authorities anything if they ever asked her about delivering the envelope.

Christina saw the numbers 381 painted on her mailbox and a number of other places around the town.  [Sindorf] told Christina he was leaving those marks to show his love for her. "381" means "three words, eight letters, one meaning—I love you." Kim testified she drove [Sindorf] around town to spray paint the numbers in various places.

Christina found [Sindorf's] actions a bit scary. She was inhibited at first, but later overcame her fears to tell what had happened.

Patricia Morrison, public health nurse and family planning nurse practitioner with the Siskiyou County Public Health Department, testified [Sindorf] came into the county's Mt. Shasta clinic with Christina on November 30, 2000. [Sindorf] said Christina needed birth control services, that it was important that it be confidential, and he was a very good friend of the family. [Sindorf's] home phone number was provided as the means of contacting Christina regarding any test results. When Ms. Morrison made it clear she was a mandated reporter and she would be required to report if someone under the age of 16 was having sex with someone who is 21 or older, [Sindorf] said he was not her partner; [Sindorf] was a friend of the family.

Christina filled out a health questionnaire indicating she had sex on a regular basis, did not always use any method of birth control and was concerned about getting pregnant. [Sindorf] was present while Ms. Morrison discussed with Christina her responses to the questionnaire. At Christina's request, [Sindorf] was present in the exam room while Ms. Morrison conducted a breast and pelvic exam of Christina. [Sindorf] stood at the head of the examination table during the exam, holding and patting Christina's hand and softly talking to her. Ms. Morrison thought the contact seemed more intimate than that of a family friend. At the end of the examination, [Sindorf] stayed in the exam room while Christina washed and dressed.

Ms. Morrison called Child Protective Services and made a report of suspected child abuse.

Jeffrey Lierly, a special agent with the California Department of Justice Bureau of Investigation, spoke with Kim regarding what she knew about [Sindorf's] relationship with Christina. Initially she denied knowing anything, but after she was granted immunity by the Attorney General's Office, she agreed to talk with Lierly. Kim told Lierly she accused [Sindorf] of having a sexual relationship with Christina and [Sindorf] responded: "All's I know now is I'm human and can make mistakes, too." [Sindorf] said Christina "was all over [him]" or "she came on to [him.]"

Kim told Lierly that one night [Sindorf] came to Kim's house and told her he needed her help to help a friend with a pregnancy test. That was why Kim was involved with Christina's pregnancy test at the gym. Kim overheard [Sindorf] and Christina talking on the walkie-talkies and [Sindorf] was generally saying comforting things to Christina, who was upset. [Sindorf] told Kim to deny the pregnancy test ever occurred. [Sindorf] suggested that if she did not deny it, she could be implicated in the situation.

[Sindorf] also instructed Kim to say she was supposed to have gone with Christina to the health clinic. When the issue of the engagement ring came up, [Sindorf] told Kim to say it was her ring. He advised Kim to deny the existence of the note sent to Christina by Ms. Hobbs.

Christina's mother Shirley testified she saw Christina and [Sindorf] together at the Denny's restaurant in Canada. Christina was looking [Sindorf] eye to eye and rubbing [Sindorf's] arm very passionately. Shirley became very upset and asked Christina to go with her to the restaurant restroom. Shirley asked her daughter what

6

she had just seen. Christina didn't answer, but looked guilty, like she had just been caught. [Sindorf] later asked for an opportunity to explain and told Shirley he was in love with Christina. Shirley later called the Canadian police who helped her relocate to a different motel for that night.

Shirley and Christina ended up driving back to California with [Sindorf], who kept saying he was in love with Christina, it was better for Christina to be with him than someone else, and kept asking Shirley if she would still remain "friends" with him. Shirley refused to remain friends. When [Sindorf] said he had discussed marriage with Christina, Shirley told him he was "a sick S.O.B." She went straight to the police when they arrived back home and sought a restraining order against him. Her first attempt was procedurally defective.

Meanwhile, [Sindorf] continued to see Christina, so Shirley met with [Sindorf] to tell him to stay away. [Sindorf] seemed embarrassed and told her he and Christina had made up the whole story the night in Canada. Shirley angrily left. When she got home, she got a call from [Sindorf] telling her if she took the matter to the police, he would have her job. Shirley got a restraining order against [Sindorf] in March 2001.

After their return from Canada, Christina became angry and cold towards Shirley. Shirley took Christina to counseling and was present when Christina denied any inappropriate relationship with [Sindorf]. Christina said she made the whole thing up to get more attention from Shirley.

*The Defense*

Christina was recalled as a witness and admitted she had denied any sexual encounters with [Sindorf] when interviewed by Shannon Bowlin (an investigator with the Siskiyou county District Attorney's Office) prior to March 2001. She referred to [Sindorf] as an old friend and a father figure.

Christina said Bowlin told her child pornography, or pictures of other girls Christina's age, had been found on [Sindorf's] computer. According to Christina, her principal also mentioned to her that he had seen such pictures from [Sindorf's] computer. Both Bowlin and the principal denied telling Christina pornography had been found on [Sindorf's] computer.

The night before Christina was admitted to Sutter Memorial hospital in March 2001, shortly before the hearing in court regarding the restraining order, she met with [Sindorf] at Kim's house. She spent two and a half hours listening to [Sindorf] tell her everything she needed to do, what she needed to believe, and what she didn't need to believe. [Sindorf] told her if she said anything, it would ruin everything. [Sindorf] told her not to believe what Bowlin was saying about him or them.

When Christina got out of the hospital 7 to 14 days later, Bowlin contacted her again and Christina decided to tell the truth of what happened. She ended up telling Bowlin part of the truth, but she still held back some things.

Bowlin testified she first interviewed Christina in January or February 2001. During that interview, Christina denied any inappropriate relationship with [Sindorf]. Bowlin talked to Christina again in March and in May 2001.

7

Christina contacted Bowlin prior to the May interview to say she was ready to tell Bowlin about the relationship between her and [Sindorf].   At the May interview, Christina said [Sindorf] was in love with her, but she looked upon him as a father figure.   She denied a sexual relationship.   It was not until a meeting with Bowlin in August 2001 that Christina said their relationship was of a sexual nature. In her experience, Bowlin could not think of a time when she interviewed a victim in this kind of circumstance where the victim immediately disclosed the relationship with the man she was involved with.   That is, in the cases where the investigation ultimately showed there was a sexual relationship, she could not recall one where the victim had "disclosed" immediately.

Catherine Golden, an investigator with the Siskiyou County District Attorney's Office, conducted an interview with Christina in May 2002.   Christina admitted she was embarrassed and not truthful in her earlier interview with Bowlin. She described various incidents of sexual contact with [Sindorf].   Golden talked to Christina again in June 2002 and confronted her with discrepancies between what she told Bowlin and what she told Golden.

Michael C., another son of Kim and stepbrother to C., testified Christina told him her mother was making her say this stuff about [Sindorf].   Christina said the accusations were not true.

Michael Preston, a coworker of Christina's mother, Shirley, said when it comes to honesty, Shirley is "morally bereft."   He denied there was "bad blood" between him and Shirley, although he considered her the instigator of a problem between him and another worker, which ended up in the other worker filing sexual harassment charges against Mr. Preston.

Clyde Aker, Shirley's former second line supervisor, testified Shirley does not have a good reputation for truthfulness and was a troublemaker.

Lierly, recalled for the defense, testified Kim told him [Sindorf] isolated her from her friends.   She also did not like the way he treated her oldest son Michael C., whom [Sindorf] considered a bad influence on C.

Although Christina's mother, Shirley, testified it was her belief a lot of Christina's emotional problems were the result of her relationship with [Sindorf], she admitted Christina had some history of depression.

The principal of the high school when Christina was there, testified [Sindorf] told him Shirley was mad because she wanted something more than a friendship from [Sindorf].   [Sindorf] complained that, "the only information they got, they didn't get right."   The principal never saw any improper conduct between [Sindorf] and Christina.[8]

---

[8] *Sindorf I*, 2005 WL 2542571 at *1-7.

## II.  GROUNDS RAISED/DEFENSES

In his Petition Sindorf raises seven grounds:  (1) the prosecution destroyed exculpatory

evidence in violation of *Brady*;[9] (2) erroneous admission of expert witness testimony; (3)

insufficiency of the evidence; (4) his sentence violated *Cunningham*;[10] (5) ineffective assistance

of trial counsel; (6) conflicted trial counsel; and (7) the imposition of the upper term violated the

*Ex Post Facto* Clause.[11]  Respondent contends that Sindorf's fifth and sixth grounds are

unexhausted.  In his Traverse Sindorf seeks an evidentiary hearing, in particular on his first

ground.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States" at the time the state court renders its decision or "was based

on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding."[12]  The Supreme Court has explained that "clearly established Federal law" in

§ 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the

---

[9] *Brady v. Maryland*, 373 U.S. 83, 87 (1962).

[10] *Cunningham v. California*, 549 U.S. 270, 288-89 (2007).

[11] This Court notes that in his counseled Traverse Sindorf adopts the arguments presented to the California Supreme Court in his petition for review.  To the extent that those arguments may differ from the arguments presented in Sindorf's *pro se* Petition, because they are fully exhausted, this Court addresses each of the grounds presented herein as presented to the California Supreme Court.

[12] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade*, 538 U.S. 63, 70-75 (2003) (explaining this standard).

time of the relevant state-court decision."[13]  The holding must also be intended to be binding

upon the states; that is, the decision must be based upon constitutional grounds, not on the

supervisory power of the Supreme Court over federal courts.[14]  Thus, where holdings of the

Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that

the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"[15]  When a claim falls

under the "unreasonable application" prong, a state court's application of Supreme Court

precedent must be "objectively unreasonable," not just "incorrect or erroneous."[16]  The Supreme

Court has made clear that the objectively unreasonable standard is "a substantially higher

threshold" than simply believing that the state-court determination was incorrect.[17]  "[A]bsent a

specific constitutional violation, federal habeas corpus review of trial error is limited to whether

the error 'so infected the trial with unfairness as to make the resulting conviction a denial of due

process.'"[18]  In a federal habeas proceeding, the standard under which this Court must assess the

prejudicial impact of constitutional error in a state court criminal trial is whether the error had a

---

[13] *Williams*, 529 U.S. at 412 (alteration added).

[14] *Early v. Packer*, 537 U.S. 3, 10 (2002).

[15] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations in original) (citation omitted); *see also Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

[16] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[17] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams,* 529 U.S. at 410).

[18] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 643 (1974)).

substantial and injurious effect or influence in determining the outcome.[19]  Because state court

judgments of conviction and sentence carry a presumption of finality and legality, the petitioner

has the burden of showing by a preponderance of the evidence that he or she merits habeas

relief.[20]

> The Supreme Court recently underscored the magnitude of the deference required:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal
> court relitigation of claims already rejected in state proceedings.  *Cf. Felker v.
> Turpin,* 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing
> AEDPA's "modified res judicata rule" under § 2244).  *It preserves authority to issue
> the writ in cases where there is no possibility fairminded jurists could disagree that
> the state court's decision conflicts with this Court's precedents.  It goes no farther.*
> Section 2254(d) reflects the view that habeas corpus is a "guard against extreme
> malfunctions in the state criminal justice systems," not a substitute for ordinary error
> correction through appeal.  *Jackson v. Virginia,* 443 U.S. 307, 332, n.5, 99 S.Ct.
> 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment).  As a condition
> for obtaining habeas corpus from a federal court, a state prisoner must show that the
> state court's ruling on the claim being presented in federal court was so lacking in
> justification that there was an error well understood and comprehended in existing
> law beyond any possibility for fairminded disagreement.[21]

> In applying this standard, this Court reviews the "last reasoned decision" by the state

court.[22]  State appellate court decisions that summarily affirm a lower court's opinion without

---

[19] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v.
Abrahamson*, 507 U.S. 619, 637-38 (1993)).

[20] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (citations omitted); *see Wood v.
Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas
relief on the basis of little more than speculation with slight support").

[21] *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (emphasis added).

[22] *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297
F.3d 911, 918 (9th Cir. 2002)); *cf. Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) (explaining
"how federal courts in habeas proceedings are to determine whether an unexplained order . . .
rests primarily on federal law," and noting that federal courts must start by examining "the last
reasoned opinion on the claim . . . . ").

explanation are presumed to have adopted the reasoning of the lower court.[23]  This Court gives

the presumed decision of the state court the same AEDPA deference that it would give a

reasoned decision of the state court.[24]

## IV.  DISCUSSION

**A.    Exhaustion**

Respondent contends that Sindorf's two ineffective assistance of counsel claims, grounds

five and six, are unexhausted.  As noted above, Sindorf concedes the issue.  This Court may not

consider claims that have not been fairly presented to the state courts.[25]  Consequently, Sindorf's

fifth and sixth grounds must be dismissed.[26]

**B.    Evidentiary Hearing**

The Supreme Court made clear in *Pinholster* that "review under [28 U.S.C.]

§ 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on

the merits."[27]  "Federal courts sitting in habeas are not an alternative forum for trying facts and

---

[23] *Ylst*, 501 U.S. at 802-03 ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); *cf. Richter*, 131 S. Ct. at 784 ("As every Court of Appeals to consider the issue has recognized, determining whether a states court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.").

[24] *See Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

[25] 28 U.S.C. § 2254(b)(1); *see Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing cases).

[26] *See Rhines v. Weber*, 544 U.S. 269, 275-78 (2005); *Engle v. Issac*, 456 U.S. 107, 125 n.28 (1982); *Rose v. Lundy*, 455 U.S. 509, 510 (1982).

[27] *Pinholster*, 131 S. Ct. at 1398-99; *see Townsend v. Sain*, 372 U.S. 293, 312-13, 319 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), *superceded in part by statute*, 28 U.S.C. 2254(e)(2) (1996).

issues which a prisoner made insufficient effort to pursue in state proceedings."[28]  "If the state-court decision 'identifies the correct governing legal principle' in effect at the time, a federal court must assess whether the decision 'unreasonably applies that principle to the facts of the prisoner's case.'"[29]  As the Supreme Court noted, "[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court."[30]  Although under *Pinholster* an evidentiary hearing in a federal habeas proceeding is not absolutely precluded, *Pinholster* also made clear that the discretion to grant a request for an evidentiary hearing is cabined by § 2254(e)(2),[31] which provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>> (A) the claim relies on—
>>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

---

[28] *Williams v. Taylor*, 529 U.S. 420, 437 (2000) (quoted with approval in *Pinholster*, 131 S. Ct. at 1401); *see Richter*, 131 S. Ct. at 787 (noting that the basic structure of federal habeas jurisdiction is designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions); *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977) ("[T]he state trial on the merits [should be] the 'main event,' so to speak, rather than a 'tryout on the road' for what will later be the determinative federal habeas hearing.").

[29] *Pinholster*, 131 S.Ct. at 1399 (quoting *Williams*, 529 U.S. at 405).

[30] *Id.*

[31] *Id.* at 1400-01.

Sindorf's request in this case does not meet that standard.  Sindorf has not identified any factual

conflict that would require this Court to hold an evidentiary hearing to resolve.  Nor does it

appear that he was denied any requested hearing in the state courts.  Accordingly, Sindorf's

request for an evidentiary hearing is **DENIED**.

**C.    Merits**

Ground 1:  *Brady* Violation

As he did before the California courts, Sindorf contends that the loss of the district

attorney's files and the resulting failure to provide the defense with exonerating information from

those files violated his constitutional rights as mandated by *Brady*.  The California Court of

Appeal recited the facts underpinning Sindorf's argument:

> ***LOSS OF THE DISTRICT ATTORNEY'S FILES***
>
> A. *Background*
>
> This case was investigated originally by the Siskiyou County District Attorney's Office (D.A.) in 2001 and 2002.  The D.A. decided not to prosecute [Sindorf].  In March 2003, the California Attorney General (A.G.) on behalf of the People, decided to prosecute and filed a felony complaint against [Sindorf].
>
> B. *The Subpoena Duces Tecum for the D.A.'s Files*
>
> Sometime prior to trial, it is unclear when, [Sindorf] issued a subpoena duces tecum to the D.A.'s office for their files.  On the first day of the court trial, November 4, 2003, [Sindorf] brought to the court's attention the failure of the D.A. to respond to the subpoena duces tecum.  [Sindorf] wanted to compare the D.A.'s files to his discovery to see if there was further information in them relevant to the defense.  The deputy A.G. offered to make an inquiry regarding the D.A.'s position or progress on the subpoena duces tecum.
>
> On November 19, 2003, the deputy A.G. informed the trial court of the receipt of a D.A. memo, dated November 17, 2003, regarding the D.A.'s files.
>
> The matter of the subpoena for the files was raised again before the trial court on November 24, 2003.  [Sindorf] complained he was informed verbally the D.A. could not find its files, but the memo received addressed the issue of only four pages of "discovery."  [Sindorf] wanted to know where the files were and wanted the court to order them brought to court.

The trial court read the memo dated November 17, 2003, from the senior legal secretary for the D.A. to the assistant D.A. and noted it listed pages 58, 74, 86, 87, 90 and 91 as being missing.

The deputy A.G. agreed the matter of the missing files needed clarification. He represented to the court the A.G. had both files of the D.A. in April 2002, that the files were copied by the A.G. in their entirety, and defense counsel was provided 107 pages of discovery from one case file and 123 pages of discovery from the other case file, "absent the six pages that are noted in this memo."

[Sindorf] stated he took the deputy A.G. at his word that the defense received everything the A.G. received, but the issue was something else. [Sindorf] referenced other subpoenas to the D.A. and indicated he was informed the D.A. was not going to prosecute based in part on the lies of the victim. [Sindorf] wanted to view the D.A.'s files to see if there was other possibly exculpatory evidence upon which the D.A. based its decision not to go forward. [Sindorf] received no response to its subpoena duces tecum and there was no memo saying the files were missing. [Sindorf] was confused by the memo of November 17th regarding missing pages and wondered how the legal secretary could determine six specific pages were missing if the entire two files were missing.

The deputy A.G. attempted to clarify the matter, indicating he received a verbal response to the inquiry regarding [Sindorf's] subpoena duces tecum that both files were missing. He requested the response be reduced to writing. And in response, either due to a simple miscommunication or lack of clarification, the deputy A.G. received the memo regarding the missing pages, which were missing "all the way back to April 2002, when the files were copied."

[Sindorf] stated, however, the discovery he received included a page 58, 74, 86, 87, 90 and 91, the pages supposedly missing. It was possible he had those pages for only one of the two files since the pagination for both files began with number one, but he could not tell from what he had with him. The deputy A.G. stated the defense had been provided everything the deputy A.G. had except the materials withheld as privileged, as listed in the privilege log, and the six previously listed pages. The deputy A.G. did not know from which file the pages were determined to be missing and the discovery provided to the defense began with sequence one again.

The trial court asked [Sindorf] the nature of his concern about the files, whether he thought the files contained materials that were not provided in discovery or accounted for by the privilege log. [Sindorf] suggested there "might be." [Sindorf] wanted the court to review the D.A. files to see if there was any exculpatory evidence in them that was not provided to the defense. [Sindorf] found it "suspicious" the D.A. had not responded to his subpoena duces tecum and now claimed the files were missing.

The deputy A.G. responded, "suspicions aside," this was essentially an untimely discovery motion on discovery materials provided over a year earlier. In addition, it was based on pure speculation and the trial court was not the entity to review page by page what discovery exists in the D.A.'s files and compare it with the discovery provided by the A.G. The proper procedure was through the discovery

15

process of section 1054 and not a subpoena duces tecum. If the defense was unhappy with the informal response provided to this point, it was up to [Sindorf] to file a formal discovery motion so the matter could be litigated before the court.

The trial court concluded the matter should be handled through the criminal discovery statutes, but did want a further response as to whether the D.A. files were available. After a response was received, it would be up to [Sindorf] to bring anything further to the court's attention.

Later that day, the deputy A.G. provided an addendum memo from the D.A. stating the two D.A. files were missing. Absent further inquiry by [Sindorf], the A.G. took the position the discovery inquiry was satisfied. When asked by the court if he had any comments, defense counsel replied, "no."

[Sindorf] did not pursue the matter further.

C. *[Sindorf's] Contentions on Appeal*

[Sindorf] claims on appeal the loss of the D.A.'s files violated his state and federal rights to due process, to confront witnesses, and to present a defense.

[Sindorf] argues the lost files were "clearly" material evidence favorable to the defense that should have been disclosed to the defense. Therefore, the failure to disclose the files violates [Sindorf's] rights under *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215] (*Brady*). [Sindorf] also cites *Arizona v. Youngblood* (1988) 488 U.S. 51, 58 [102 L.Ed.2d 28] (*Youngblood*), for the proposition that "the *Brady* rule applies even to potentially useful evidence if the suppression of evidence is in bad faith [,]" that is, "the prosecution is aware of the evidentiary value of the evidence to the defense." [Sindorf] then points the court to *People v. Serrato* (1965) 238 Cal.App.2d 112 (*Serrato*) to argue fundamental notions of due process require the prosecution to "bear the burden of lost or destroyed evidence where the lost evidence is clearly material, possibly exonerating and lost solely due to the action of the state." By analogy to the reasoning of *Brady, Youngblood,* and *Serrato,* [Sindorf] contends reversal is required in this case.

[Sindorf] also contends the loss of the files violates his state due process rights under article I, sections 7 and 15 of the California Constitution. The only cases [Sindorf] cites are *People v. Nation* (1980) 26 Cal.3d 169 (*Nation*), and *People v. Hitch* (1974) 12 Cal.3d 641 (*Hitch*).[32]

The Court of Appeal rejected Sindorf's arguments, holding:

D. *Analysis*

Preliminarily we note the D.A.'s office initial response to the subpoena duces tecum for the two files was a nonresponsive memo dated November 17, 2003, regarding six missing pages of discovery. As a result, in the trial court the discussion on the record about the files and whether or not the defense was missing discovery is less than clear. The trial court, the prosecutor and the defense attorney discuss

---

[32] *Sindorf I*, 2005 WL 2542571 at *7-9.

interchangeably the alleged six missing pages and the two missing files as they relate to the subpoena duces tecum.  Later in an addendum memo the D.A.'s office indicated the two files were missing.

A review of the record reflects [Sindorf] was provided a copy of the D.A.'s files by the A.G. in discovery and acknowledges receiving everything the A.G. received from the D.A. except the materials identified by the "privilege log" and except, perhaps, the six pages identified by the D.A.'s November 17 memo.  It is, therefore, unclear whether [Sindorf] in alleging on appeal the violation of his constitutional rights by the loss of the D.A.'s files is asserting the loss of the six pages, the loss of some unknown and unpaginated material not copied by the A.G., or the complete loss of the original files.

The mix of authorities to which we are referred is also confusing.

*Brady* held a prosecutor's failure to disclose favorable evidence to an accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  (*Brady, supra,* 373 U.S. at p. 87 [10 L.Ed.2d at p. 218].)  To establish that the government's failure to turn over evidence violates *Brady,* [Sindorf] must demonstrate (1) the undisclosed evidence was favorable, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) the evidence was material to the defense. (See *Strickler v. Greene* (1999) 527 U.S. 263, 280-281 [144 L.Ed.2d 286, 301-302]; *In re Brown* (1998) 17 Cal.4th 873, 879.)

The failure to preserve, or the destruction of evidence by the prosecution, was specifically addressed in *Youngblood* and in *California v. Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413] (*Trombetta* ).  In *Trombetta,* the United States Supreme Court held the government has a duty under the United States Constitution to preserve evidence "that might be expected to play a significant role in the [defendant's] defense." To meet this standard, the evidence must "both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  (*Trombetta, supra,* at pp. 488-489 [81 L.Ed.2d at p. 422], fn. omitted.)  In *Youngblood* the United States Supreme Court added that to show a denial of federal constitutional due process from the destruction of such evidence, the defendant must also show that the police acted in bad faith. (*Youngblood, supra,* 488 U.S. at p. 58 [102 L.Ed.2d at p. 289].)  Our Supreme Court has expressly adopted the holdings of *Trombetta* and *Youngblood.*  (*People v. Frye* (1998) 18 Cal .4th 894, 942-943; *People v. Zapien* (1993) 4 Cal.4th 929, 964; *People v. Cooper* (1991) 53 Cal.3d 771, 810-811.)

In *People v. Serrato, supra,* 238 Cal.App.2d 112, the defendant, through no fault of his own, was deprived of his effective right of appeal by the failure of the trial court clerk to comply with the requirements of the law for preparation of a clerk's transcript and reporter's transcript for appeal.  The court held this violated the defendant's fundamental constitutional rights.  (*Id.* at p. 119.)  We fail to see how this is applicable to [Sindorf's] situation here.

*Nation, supra,* 26 Cal.3d 169 and *Hitch, supra,* 12 Cal.3d 641, involved the same issue regarding the loss or destruction of evidence by the prosecution as *Youngblood* and *Trombetta.*  Both *Nation* and *Hitch* were premised on federal due process and have not survived *Trombetta* and *Youngblood.*  (*People v.. Johnson* (1989) 47 Cal.3d 1194, 1234; *People v. Frye, supra,* 18 Cal.4th 894, 942.) Moreover, the California Supreme Court has rejected the contention that *Trombetta* and *Youngblood* should not apply in California as a matter of state law.  (*People v. Cooper, supra,* 53 Cal.3d at p. 811.)

Wending our way through the authorities cited by [Sindorf], we conclude *Trombetta* and *Youngblood* are the most applicable to [Sindorf's] situation. However, we further conclude [Sindorf] has failed to show any due process violation under those authorities.

First, to the extent [Sindorf] is broadly complaining about the loss of the original D.A. files copied by the A.G., there is no showing, nor can we think of how [Sindorf] could show, [Sindorf's] receipt of the *copy* of such files was not "comparable evidence" satisfying [Sindorf's] due process rights to potentially exculpatory or relevant impeachment evidence held by the prosecution.  (*Trombetta, supra,* 467 U.S. at pp. 488-489 [81 L.Ed.2d at p. 422].)

Second, to the extent [Sindorf] is asserting a possible loss or destruction of some unknown, possibly unpaginated, material from the original files beyond the specifically identified six pages, we find such assertion entirely speculative.  There is simply nothing in the record which suggests the D.A. lost more than the identified missing six pages of material, if indeed the six pages were actually lost.  It is even more speculative, bordering on imaginative, that any such particular material was exculpatory or had impeachment value to the defense that was apparent to the custodian of the files when the material was lost and that no comparable evidence was reasonably available.  (See *People v. Frye, supra,* 18 Cal.4th at pp. 943-944 .)

Finally, to the extent [Sindorf] is asserting the loss of the six pages identified by the D.A. and A.G., we question whether [Sindorf] has actually shown those pages are lost.  Defense counsel told the trial court he had received pages in discovery with the same numbers as the pages the November 17 memo listed as missing.  Defense counsel suggested it was possible he had those numbered pages for only one of the two D.A. files, but counsel could not tell from what he had with him at the time. This did not prevent counsel from later checking his discovery materials and reporting back to the trial court that he had only one set of such numbered pages or that his numbering appeared to be that of the A.G., not the D.A.  Counsel never did so, perhaps because he could tell he did have the numbered pages from both D.A. files.  Furthermore, it is often possible to determine a page is missing from copied materials even without relying on numbered pagination because one page may not logically follow the previous page.  Defense counsel never reported finding such a problem in the photocopied material from the D.A.'s files.  Thus, we cannot say with certainty, given the considerable confusion in the trial court over what, if anything, was missing, that the six pages were definitely missing from the files photocopied for the [Sindorf].

Even assuming the pages were lost, however, [Sindorf] has failed to make the requisite showing for relief. It is quite possible the six pages were negligently misplaced, left out of the files sent to the A.G., or otherwise lost. (*People v. Ochoa* (1998) 19 Cal.4th 353, 417 [negligent failure to preserve evidence does not violate due process].) There is nothing in the record to support [Sindorf's] speculation that these specific six pages had apparent exculpatory or impeachment value so that their loss can be considered to be in bad faith.

[Sindorf] has not shown any violation of his constitutional rights by the D.A.'s loss of its original files or any part of them.[33]

"[T]he Constitution does not require the prosecutor to share all useful information with the defendant."[34] *Brady*, and its progeny, require the Government to disclose material information that is "favorable to the accused, either because it is exculpatory, or because it is impeaching."[35] A *Brady* violation occurs only where there is a "reasonable probability" that a different verdict would have resulted from disclosure of the information that the defendant claims was suppressed.[36] That is, "a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial."[37] The failure to disclose information that would impeach a government witness may also constitute a violation of the *Brady* rule.[38] The failure to preserve

---

[33] *Id.* at *7-12.

[34] *United States v. Ruiz,* 536 U.S. 622, 629 (2002) (citing *Weatherford v. Bursey*, 429 U.S. 545, 549 (1977) ("There is no general constitutional right to discovery in a criminal case")).

[35] *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999).

[36] *Id.* at 281.

[37] *United States v. Bagley,* 473 U.S. 667, 678 (1985).

[38] *See United States v. Giglio*, 405 U.S. 150, 154 (1972).

"potentially useful evidence" does not violate due process "*unless a criminal defendant can show bad faith on the part of the police.*"[39]

The entire thrust of Sindorf's argument is based upon the fact that the district attorney declined to prosecute because of questions concerning the credibility of the victim, i.e., as described to defense counsel "lies of the victim." Sindorf also argues that the missing files "necessarily contained evidence favorable to the accused or the District Attorney's office would not have abandoned its pursuit of the case." Sindorf bears the burden of establishing a violation of his constitutional rights by preponderance of the evidence,[40] not mere supposition, conjecture or speculation.[41] In this case, as the California Court of Appeals noted, it is unclear from the record that any of the district attorney's files were actually missing. Furthermore, as is illustrated by Sindorf's third ground, the credibility of the victim was challenged because of her prior inconsistent statements as evidenced by the District Attorney's files. Finally, there is a complete paucity of any evidence that, even if the identified pages were in fact missing, there is no evidence that the absence of those pages is in any way attributable to any bad faith on the part of the State's agents.

Based upon the record before it, this Court cannot find that the decision of the California Court of Appeal was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court

---

[39] *Arizona v. Youngblood,* 488 U.S. 51, 58 (1988) (emphasis added); *see also Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004) (per curiam) (applying *Youngblood*).

[40] *Pinholster*, 131 S. Ct. at 1398 (citing *Viscotti*, 537 U.S. at 25); *Silva*, 279 F.3d at 835.

[41] *See Bartholomew*, 516 U.S. at 8 (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

renders its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[42]  Nor, viewing the matter through the doubly-deferential lens of *Mirzayance-Richter*, can this Court find that the state court unreasonably applied the correct legal principle to the facts of Sindorf's case within the scope of *Andrade-Williams-Landrigan-Richter*; i.e., the state court decision was not more than incorrect or erroneous, its application of clearly established federal law was not objectively unreasonable. Sindorf is not entitled to relief under his first ground.

Ground 2:  Expert Witness Testimony

A former investigator for the district attorney's office testified as a Child Sexual Abuse Accommodation Syndrome ("CSAAS") expert to explain the inconsistencies between the victim's earlier denials of sexual conduct with Sindorf and her testimony at trial concerning sexual contact between Sindorf and the victim.  Sindorf contends that, because this testimony violated his rights under the Confrontation Clause and his right to present a defense, the trial court impermissibly allowed it.  The California Court of Appeal summarized the challenged testimony:

> **ADMISSION OF INVESTIGATOR'S OPINION TESTIMONY**
>
> Shannon Bowlin testified she investigated sexual assault cases for the D.A., was a SART (Sexual Assault Response Team) member, and was previously a police officer and a deputy sheriff for nine years in San Diego.  She had interviewed underage girls with regard to allegations of unlawful sex in "over a hundred [cases], for sure."
>
> On appeal, [Sindorf] complains the trial court committed reversible error in allowing Bowlin "to render expert opinions on the characteristics, behaviors and motivations of underage girls who have been molested by older men with whom they are romantically involved."  [Sindorf] complains Bowlin was unqualified to provide

---

[42] 28 U.S.C. § 2254(d).

expert opinion testimony regarding CSAAS (Child Sexual Abuse Accommodation Syndrome) and her lay opinion was irrelevant.  We find no error.

[Sindorf] refers to a portion of Bowlin's testimony where she was asked to "characterize [Christina's] reluctance to at first divulge her sexual relationship with [Sindorf]?  Was that normal or abnormal?"  [Sindorf] objected the question called for an opinion and there was no foundation for Bowlin's expertise.  Specifically, [Sindorf] argued the question asked, "essentially for a psychological profile . . . and I don't think there is sufficient foundation laid for that."  "Simply because she's interviewed hundreds of girls doesn't mean she's an expert, and the reasons people may have for the psychological pressures or the psychological perspective on why one might say one thing and one another, and that's where we're going here."  The court suggested the question be narrowed to ask whether this was unusual "in the experience that she has personally had, . . . versus a broader sort of a psychological evaluation of how alleged sex victims in general respond."  The prosecutor then asked Bowlin, given her experience, how usual or unusual it was for an underage girl to at first deny she was sexually involved with an older man.  [Sindorf] objected that "how unusual is it is not the same as how unusual did you find it in your interviews."  The prosecutor explained that was what he asked.  After making sure Bowlin understood the question of how unusual it was referred to her own personal experience and not some broad generalization, the court overruled the objection.  Bowlin answered:  "In my experience, almost every—I cannot think of a time when I have interviewed a victim in these circumstances where they have immediately disclosed their relationship with the man they were involved with."

Defense counsel asked Bowlin, on redirect examination, whether what she was saying was that an initial denial of a sexual relationship by an underage girl meant in fact the girl had a sexual relationship.  Bowlin responded "no," but added, without objection from [Sindorf], "in cases of unlawful sexual intercourse where there is also a romantic relationship of some kind and you have a teenaged girl, they're very protective of these men, and, no, they do not disclose initially."[43]

The Court of Appeal rejected Sindorf's challenge to this testimony:

Respondent argues Bowlin's testimony was not opinion testimony at all.  We disagree.  In the context of the prosecutor's questioning of how unusual it was for a victim to initially deny a sexual relationship, Bowlin answered, essentially, that in her experience it was typical.  In fact, based on her personal experience, underage girls involved in a sexual relationship with an older man had always initially denied the relationship.  Bowlin also later stated these girls tend to be "protective" of the men with whom they are involved.  Both these statements (the girls do not initially disclose and are protective of the man) are in effect opinions.  However, while we

_____

[43] *Sindorf I*, 2005 WL 2542571 at *12-13.

agree Bowlin's testimony is properly characterized as opinion testimony, we do not agree with [Sindorf] that it was improperly admitted.

An expert may testify in the form of an opinion. (Evid.Code, § 801.) "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid.Code, § 720, subd. (a).) A trial court has "considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion is shown." (*People v. Kelly* (1976) 17 Cal.3d 24, 39.) "In considering whether a person qualifies as an expert, the field of expertise must be carefully distinguished and limited." (*People v. King* (1968) 266 Cal.App.2d 437, 445.)

Here Bowlin did not have the qualifications of an expert in the field of psychology and could not testify to general psychological behaviors or motivations of underage girls involved in sexual relationships with older men. However, [Sindorf] failed to object to the portion of Bowlin's testimony expressing the general opinion that underage girls involved in situations of unlawful sex want to protect the man with whom they are involved. [Sindorf] has forfeited any error in the admission of such testimony. (Evid.Code, § 353, subd. (a); *People v. Boyette* (2002) 29 Cal.4th 381, 424.)

With respect to the portion of Bowlin's testimony expressing her opinion, limited to her experience, that underage girls involved in situations of unlawful sex did not initially disclose the relationship, Bowlin did have considerable, specialized experience in investigating situations similar to Christina's for law enforcement or prosecution. She testified she had interviewed over a hundred underage girls with regard to allegations of unlawful sex in her prior positions with law enforcement and then her position as a D.A. investigator and SART member. The trial court carefully limited her testimony to just such personal experience. The trial court did not abuse its discretion in impliedly finding her qualified as an expert in the limited area of investigation of underage girls involved in sexual relationships with older men.

A properly qualified expert may offer an opinion relating to a subject that is beyond common experience, if that expert's opinion will assist the trier of fact. (Evid.Code, § 801, subd. (a).) The trier of fact does not need to be wholly ignorant of the subject matter of the opinion to justify the admission of expert opinion testimony. The testimony is admissible as long as it will "assist" the trier of fact. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299-1300 (*McAlpin* ).)

*People v. McAlpin, supra,* 53 Cal.3d 1289 (*McAlpin* ), is helpful. In *McAlpin* the California Supreme Court concluded a law enforcement officer who properly qualified as an expert could testify to the common reactions of a parent of a child molestation victim, including their delay in reporting the molestation. (*McAlpin, supra,* at pp. 1300-1302.) Such testimony was not admissible to prove the underlying molestation, but was admissible to rehabilitate the testimony of the parent as a corroborating witness after her credibility had been challenged. (*Ibid.*) The expert testimony was helpful to the trier of fact because it helped correct a common

misassumption that a parent would always promptly report a molestation. (*Id.* at p. 1302.) It was relevant to an evaluation of the parent's credibility. (*Ibid.*)

In *People v. Brown* (2004) 33 Cal.4th 892 (*Brown* ), the California Supreme Court considered the admission of expert testimony regarding the behavior of victims of domestic violence. Using reasoning similar to *McAlpin,* the Supreme Court held the testimony was admissible under Evidence Code section 801 to assist the jury in evaluating the credibility of the victim's trial testimony when it was inconsistent with earlier statements. (*Brown, supra,* at pp. 905-907.)

Here [Sindorf] sought to impeach Christina's testimony regarding the sexual acts occurring between her and [Sindorf] with, among other things, Christina's multiple denials of any sexual relationship with [Sindorf] in her first several interviews with law enforcement. By analogy to *McAlpin* and *Brown,* Bowlin's expert testimony regarding underage girls initially denying unlawful sexual relationships was admissible and relevant to assist the court, as the trier of fact, in evaluating Christina's credibility. We are confident the trial court, as the trier of fact, remained aware of Bowlin's limited expert qualifications and gave her opinion its appropriate weight.[44]

The Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts."[45] "The introduction of unfairly prejudicial evidence against a defendant in a criminal trial . . . does not amount to a violation of due process unless the evidence is so extremely unfair that its admission violates fundamental conceptions of justice."[46] "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules."[47] In criminal actions, "[t]he States are free to provide such procedures as they choose, including rules of evidence, provided that none of them infringes a guarantee in the Federal Constitution."[48] The Supreme

---

[44] *Id.* at *13-14.

[45] *Crane v. Kentucky*, 476 U.S. 683, 689 (1986).

[46] *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir. 1998).

[47] *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983)).

[48] *Burgett v. Texas*, 389 U.S. 109, 113-14 (1967).

Court has made clear that federal habeas power does not allow granting relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the admissibility of evidence.[49]   In this context, the Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly, limiting them to specific guarantees enumerated in the bill of rights.[50]   For example, the Supreme Court has barred the introduction of evidence in state court criminal proceedings that violated the Fourth Amendment (search and seizure),[51] Fifth Amendment (confessions),[52] Sixth Amendment (Confrontation Clause),[53] and (right to counsel).[54]   On the other hand, in deciding cases involving the Federal Rules of Evidence or federal evidentiary statutes, the Supreme Court is acting in its supervisory capacity over the lower federal courts.[55]   "'Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension.'"[56]

---

[49] *McGuire*, 502 U.S. at 72 (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

[50] *McGuire*, 502 U.S. at 73 (citing *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

[51] *Mapp v. Ohio*, 367 U.S. 643 (1961).

[52] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[53] *Crawford v. Washington*, 541 U.S. 36 (2004); *Pointer v. Texas*, 380 U.S. 400 (1965) (transcript of preliminary hearing without assistance of counsel to confront and cross-examine absent witness inadmissible).

[54] *Burgett*, 389 U.S. at 114-15 (evidence of prior conviction obtained in violation of Sixth Amendment right to counsel inadmissible).

[55] *See Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006).

[56] *Id.* (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)).

The Ninth Circuit has consistently rejected challenges to CSAAS testimony,[57] and the

Supreme Court has never held that it was inadmissible.  Sindorf's argument also fails on at least

two other points.  First, Federal Rule of Evidence 702, like its California counterpart, allows a

person to offer an opinion as an expert based upon "knowledge, skill, experience, training, or

education."  Federal courts, like their state counterparts, not infrequently allow law enforcement

personnel to testify as "experts" based upon their experience and/or training.[58]  Second, like

California, the decision of the trial court on the admissibility of an expert opinion is reviewed for

abuse of discretion.[59]  Although the Ninth Circuit has suggested that an abuse of discretion may

also amount to a constitutional violation,[60] the Supreme Court has never held that abuse of

discretion is an appropriate basis for granting federal habeas relief.  Indeed, quite to the contrary,

the Supreme Court has strongly suggested that, while abuse of discretion is an appropriate

---

[57] *See, e.g., Brodit v. Cambra*, 350 F.3d 985, 991 (9th Cir. 2003) (citing *United States v. Bighead*, 128 F.3d 1329 (9th Cir. 1997); *United States v. Antone*, 981 F.2d 1059 (9th Cir. 1992). Sindorf's reliance on *Franklin v. Henry*, 122 F.3d 1270 (9th Cir. 1997) is significantly misplaced. While the *Franklin* panel did, in fact, note that some jurisdictions had found CSAAS testimony wanting, that was not the issue before the *Franklin* panel.  The issue was the exclusion of testimony that the victim had also accused her mother of sexually molesting her.  The *Franklin* panel, noting that the primary evidence was CSAAS testimony, held that excluding the evidence that bore on the victim's credibility, i.e., she was "capable of sexual fantasies" was not harmless. 122 F.3d at 1273.

[58] *See e.g., United States v. Matera*, 489 F.3d 115, 121 (2d Cir. 2007) (testimony on composition and organization of New York crime families); *United States v. Evans*, 272 U.S. 1069, 1094 (8th Cir. 2001) (recruitment of prostitutes, relationship between prostitutes and pimps); *United States v. Hankey*, 203 F.3d 1160, 1167-69 (9th Cir. 2000) (gang affiliations and consequences of gang membership); *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (IRS agent testimony that activities were illegal); *United States v. Diaz*, 878 F.2d 608, 617 (2d Cir. 1989) (operations of narcotic dealers); *see also Knapp v. White*, 286 F. Supp. 2d 766, 777 (E.D. Mich. 2003) (testimony that children often delay in reporting sexual abuse).

[59] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142-43 (1997).

[60] *See Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc).

standard on direct review, in a federal habeas proceeding it is not.[61]  Because Sindorf fails to

present a question of constitutional dimension, he is not entitled to relief under his second

ground.

Ground 3:  Insufficiency of the Evidence

Sindorf contends that the evidence was so inherently unreliable that it rendered it

insufficient to support his conviction.  The California Court of Appeal disagreed:

> **SUFFICIENCY OF THE VICTIM'S TESTIMONY**
>
> [Sindorf] claims this case presents one of those relatively rare situations
> where the testimony supporting the verdicts is inherently improbable or unreliable
> as a matter of law.  Analogizing primarily to cases involving government informants
> (*People v. Medina* (1974) 41 Cal.App.3d 438, 452; *People v. Green* (1951) 102
> Cal.App.2d 831, 834), although noting one case involving uncontradicted affidavits
> of coaching and tampering with a child victim/witness (*People v. Hudson* (1934) 137
> Cal.App. 729, 730), [Sindorf] contends Christina's testimony was coerced by the
> demands of her mother and by Christina's desire to get more attention from her
> mother.   [Sindorf] also claims Christina's mother inflamed Christina against
> [Sindorf] by telling her [Sindorf] had "pornography" or "picture of girls like [her]"
> on his computer.
>
> "[E]vidence which is produced by coercion is inherently unreliable and must
> be excluded under the due process clause."  (*People v. Lee* (2002) 95 Cal.App.4th
> 772, 786-787, italics omitted.)   There is some evidence in the record to support
> [Sindorf's] claims of coercion.   However, in light of the evidence significantly
> corroborating Christina's trial testimony, the trial court as the trier of fact was not
> required to reject Christina's testimony as unreliable as a matter of law.  (*People v.
> Sepeda* (1977) 66 Cal.App.3d 700, 707-709.)  Important corroboration of Christina's
> testimony was provided by the testimony of Kim regarding the pregnancy test she
> took to Christina at the gym, [Sindorf's] instruction to Kim to deny the test ever
> occurred or she could be "implicated," Kim's statement to the investigator of
> [Sindorf's] implicit admission of his sexual relationship when accused of it by Kim,
> and [Sindorf's] requests that, if asked, Kim should say the engagement ring was hers,
> that she was originally the person who was supposed to accompany Christina to the

---

[61] *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) ("It is not even whether it was an abuse of
discretion for her to have done so—the applicable standard on direct review. The question under
AEDPA is instead whether the determination of the Michigan Supreme Court that there was no
abuse of discretion was "an unreasonable application of . . . clearly established Federal law.
§ 2254(d)(1)")

health clinic, and that she should deny the existence of the note sent to Christina by Ms. Hobbs. Kim also drove [Sindorf] around town to spray paint the numbers "381" in various places. The public health nurse, Ms. Morrison, provided further circumstantial evidence of the sexual relationship between [Sindorf] and Christina in her testimony regarding their visit to the health clinic. That a sexual relationship had started is one reasonable inference even from [Sindorf's] own first September 2000 e-mail to Christina stating, "I am partially running off the 'L' word, too, and this is definite boost. I had the time of my life tonight and I owe it all to you." Further evidence of [Sindorf's] relationship with Christina was memorialized in his December 2000 e-mail to her "my love grows stronger for you with each passing day. Thank you for being the most beautiful thing in my life. I love you more than words can say. Think of me and I will be by your side, I promise. Love forever, Kurt."

Thus, this case simply presented a situation where a wealth of conflicting information was presented to the trial court. It was up to the court, as the trier of fact, to resolve the conflicts and inconsistencies in the testimony and decide the credibility of the witnesses. We will not do so on appeal. (*People v. Young* (2005) 34 Cal.4th 1149, 1181; *People v. Barnes* (1986) 42 Cal.3d 284, 303-306.) We conclude substantial evidence supports the verdicts of the trial court.[62]

As articulated by the Supreme Court in *Jackson*, the constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[63] This Court must, therefore, determine whether the California court unreasonably applied *Jackson*. In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial.[64] Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume—even if it does

---

[62] *Sindorf I*, 2005 WL 1542571 at *14-15.

[63] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 130 S. Ct. 665, 673 (2010) (reaffirming this standard).

[64] *Jackson*, 443 U.S. at 318-19.

not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution."[65]

Sindorf misperceives the role of a federal court in a habeas proceeding challenging a state-court conviction. This Court is precluded from either re-weighing the evidence or assessing the credibility of witnesses. Where, as in this case, the question is one of credibility, the finding of the finder-of-fact carries the day.[66] Under *Jackson*, the role of this Court is to simply determine whether there is any evidence, if accepted as credible by the finder-of-fact, sufficient to sustain conviction.[67] In this case, the California Court of Appeal determined that the evidence, found to be credible by the trier of fact was sufficient to support Sindorf's conviction under California law. Although it might have been possible to draw a different inference from the evidence, this Court is required to resolve that conflict in favor of the prosecution.[68] Sindorf bears the burden of establishing by clear and convincing evidence that these factual findings were erroneous;[69] a burden Sindorf has failed to carry. The record does not compel the conclusion that no rational trier of fact could have found proof of guilt, especially considering the double deference owed under *Jackson* and AEDPA. Sindorf is not entitled to relief under his third ground.

---

[65] *Id.* at 326; *see McDaniel*, 130 S. Ct. at 673-74.

[66] *See Bruce v Terhune*, 376 F.3d 950, 957 (9th Cir. 2004).

[67] *See Schlup v. Delo*, 513 U.S. 298, 340 (1995).

[68] *See Jackson*, 443 U.S. at 326.

[69] 28 U.S.C. § 2254(e)(1).

Case 2:11-cv-01547-JKS   Document 26   Filed 01/09/13   Page 30 of 33

Ground 4:  *Cunningham* Violation

In *Sindorf II* the California Court of Appeal concluded that the trial court violated

*Cunningham* in sentencing Sindorf to the upper term on one of the convictions for unlawful

sexual intercourse with a minor (Penal Code § 261.5(d)), vacating his sentence and remanding

the case to the trial Court for resentencing consistent with California's determinate sentencing

law.[70]  The Court of Appeal, however, rejected Sindorf's claim that the imposition of consecutive

sentences also violated *Cunningham*.[71]  On remand, the trial court again sentenced Sindorf to the

upper term on the unlawful sexual intercourse with a minor conviction.  Sindorf contends that in

so doing, the trial court violated the mandate in *Cunningham*, i.e., absent a jury finding of an

aggravating factor his maximum sentence was the mid-term.  Sindorf argues that, although he

waived his right to a jury trial on the issue of guilt, he did not waive his right to a jury with

respect to the use of aggravated facts in determining his sentence.  Sindorf also argues that the

imposition of consecutive sentences absent a jury finding violates *Cunningham*.[72]  In *Sindorf III*

the California Court of Appeal, after examining the trial court's basis for re-imposing the eight-

year sentence, rejected Sindorf's contentions:

> Imposing the upper term for the stated reasons was well within the trial
> court's discretion.  Since the upper term is now the statutory maximum, the trial court
> did not violate [Sindorf's] Sixth Amendment rights when it sentenced him to the
> upper term.
> [Sindorf] claims that *Sandoval* and the amended version of Penal Code
> section 1170 did not solve the constitutional problem identified by *Cunningham,* that
> the middle term remains the presumptive term, and that the DSL still violates his

---

[70] *Sindorf II*, 2007 WL 4306839 at *19.

[71] *Id.* at *18 (citing *People v. Black*, 161 P.3d 1130, 1145 (Cal. 2007) ("*Black II*")).

[72] This argument is foreclosed by the Supreme Court's decision in *Oregon v. Ice*, 555
U.S. 160, 168-72 (2009).

Sixth Amendment rights.  *Sandoval* resolved these issues contrary to [Sindorf's] claims.  We are bound to follow *Sandoval.*  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)[73]

Sindorf's argument that the California Court of Appeal misconstrued or misapplied

*Sandoval*[74] is beyond the purview of this Court.[75]  It is a fundamental precept of dual federalism

that the states possess primary authority for defining and enforcing the criminal law.[76]  "[A] state

court's interpretation of state law, including one announced on direct appeal of the challenged

conviction, binds a federal court sitting in habeas corpus."[77]  A determination of state law by a

state intermediate appellate court is also binding in a federal habeas action.[78]  This is especially

true where the highest court in the state has denied review of the lower court's decision.[79]

---

[73] *Sindorf III*, 2009 WL 4878675 at *4-5.

[74] *People v. Sandoval*, 161 P.3d 1146, 1159-67 (Cal. 2007) (holding that "reformed" Penal Code § 1170 granted the trial court broad discretion in determining whether to impose a sentence in low, middle, or upper term, and that application of the "reformed" section did not violate the *Ex Post Facto* clause).

[75] *Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied).

[76] *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (it is presumed that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002); *see also Engle v. Isaac*, 456 U.S. 107, 119 (1982) (challenging the correctness of the application of state law does not allege a deprivation of federal rights sufficient for habeas relief); *Bell v. Cone,* 543 U.S. 447, 455 (2005) (a federal court may not lightly presume that a state court failed to apply its own law).

[77] *Bradshaw v. Richey,* 546 U.S. 74, 76 (2005); *see West v. AT&T,* 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").

[78] *See Hicks v. Feiock,* 485 U.S. 624, 629-30 & n.3 (1988) (noting state appellate court's determination of state law is binding and must be given deference).

[79] *Id.*; *see West,* 311 U.S. at 237 ("This is the more so where, as in this case, the highest court has refused to review the lower court's decision rendered in one phase of the very litigation

(continued...)

A petitioner may not transform a state-law issue into a federal one by simply asserting a violation of due process.[80]  "[The Supreme Court has] long recognized that a mere error of state law is not a denial of due process."[81]  "[A]bsent a specific constitutional violation, federal habeas corpus review of trial error is limited to whether the error 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[82]  "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension."[83]  Because Sindorf fails to present a question of constitutional dimension, he is not entitled to relief under his fourth ground.

Ground 7:  *Ex Post Facto* Clause Violation

The California Court of Appeal also rejected Sindorf's argument that application of the amended version of Penal Code § 1170 violated the *Ex Post Facto* Clause, holding:  "[Sindorf's] claim that his sentencing under the amended version of Penal Code section 1170 amounted to an unconstitutional ex post facto application of law and violated due process is also foreclosed by *Sandoval*."[84]  Sindorf's *ex post facto* argument before this Court is foreclosed by the decision of

---

[79](...continued)
which is now prosecuted by the same parties before the federal court."); *Shannon v. Newland*, 410 F.3d 1083, 1087 (9th Cir. 2005) (same).

[80] *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996).

[81] *Cooke*,131 S. Ct. at 863 (internal quotation marks and citations omitted).

[82] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

[83] *Smith v. Phillips*, 455 U.S. 209, 221 (1982) (citations omitted); *see also Sanchez-Llamas*, 548 U.S. at 345 ("It is beyond dispute that we do not hold a supervisory power over the courts of the several States." (quoting *Dickerson v. United States*, 530 U.S. 428, 438 (2000))).

[84] *Sindorf III*, 2009 WL 4878675 at *5.

the Ninth Circuit in *Chiono v. Kernan*.[85]  Sindorf is not entitled to relief under his seventh

ground.

## V.  CONCLUSION AND ORDER

Sindorf is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ

of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of

Appealability.[86]  Any further request for a Certificate of Appealability must be addressed to the

Court of Appeals.[87]

The Clerk of the Court is to enter judgment accordingly.

Dated:  January 8, 2013.

                                                    /s/ James K. Singleton, Jr.
                                              JAMES K. SINGLETON, JR.
                                              United States District Judge

---

[85] 581 F.3d 1182, 1185 (9th Cir. 2009) ("We have also determined that no ex post facto concerns are generated by remanding for resenting for a *Cunningham* violation if the sentencing court follows the California Supreme Court's instructions in *Sandoval*."  (citing *Butler v. Curry*, 528 F.3d 624, 652 n.20 (9th Cir. 2008))).

[86] 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003))).

[87] *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.